# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER WILLIAMS,
     709 Pickering Dr., Unit B
     Murrells Inlet, SC 29567,

        Plaintiff,

        v.

CYNTHIA A. NEWBERG,
     7707 Ironforge Ct.
     Derwood, MD 20855
     *in her individual capacity*,

HANS CHRISTOPHER GRUNDLER,
     4231 Eastgate Dr.
     Ann Arbor, MI 48103,
     *in his individual capacity*,

PAUL M. GUNNING,
     4840 Allenby Rd.
     Fairfax, VA 22032,
     *in his individual capacity*,

JOSEPH M. GOFFMAN,
     3208 Highland Pl. NW
     Washington, DC 20008,
     in his individual capacity,

JAN DOES 1-50,
        Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

**CIVIL RIGHTS COMPLAINT
FOR MONETARY AND
DECLARATORY RELIEF**

Plaintiff Peter Williams seeks monetary damages and declaratory relief against Cynthia A. Newberg, Hans Christopher Grundler, Paul M. Gunning, Joseph M. Goffman, and Jan Doe defendants 1-50 pursuant to *Bivens v. Six Unknown Named Agents of the Fed'l Bureau of Narcotics*, 403 U.S. 388 (1971), this Court's authority under its enabling legislation, Organic Act of 1801, Ch. 15, 2 Stat. 103 (codified as amended at D.C. CODE § 11-501), the common law under 28 U.S.C. §§ 1332, 1367, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, based on the allegations herein. Plaintiff intends to supplement this Complaint if his pending administrative claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"), are denied.

# TABLE OF CONTENTS

Nature of the Action...................................................................................................................2

Parties........................................................................................................................................3

Jurisdiction and Venue..............................................................................................................4

    Article III Case or Controversy ...........................................................................................5

    Sovereign Immunity ............................................................................................................6

Legal Background......................................................................................................................6

    Clean Air Act and Judicial Review .....................................................................................6

    Avenues for Administrative Reconsideration......................................................................7

    American Innovation and Manufacturing Act .....................................................................9

    HFC Program .......................................................................................................................9

    *Bivens* and the FTCA........................................................................................................10

    Organic Act of 1801 .........................................................................................................11

    Other Relevant Non-Environmental Statutes and Regulations ........................................13

    Constitutional Provisions ..................................................................................................15

    Qualified Immunity ...........................................................................................................17

    Punitive Damages and Prejudgment Interest ....................................................................18

Factual Background .................................................................................................................18

    Plaintiff's Involvement in Refrigerant-Gas Industry........................................................19

    Plaintiff's Advocacy for Environmental Justice...............................................................19

    Plaintiff's Involvement in Implementing the AIM Act.....................................................23

    EPA's Stratospheric Protection Division...........................................................................24

    Plaintiff's New-Market-Entrant Application under the HFC Program ..............................25

    New Era Group versus New ERA Group, Inc. ..................................................................27

    Efforts to Correct Defendants' Errors in Denying Plaintiff's Application.........................34

    Defendants' Intransigence, Bad Faith, and Misconduct ...................................................36

    Post-Denial HFC Allocations ...........................................................................................41

    Necessity for Damages to Make Plaintiff Whole .............................................................43

Causes of Action......................................................................................................................44

Count I *Bivens* Claim for Damages as a Federal District Court .............................................44

Count II *Bivens*-Style Claim for Damages under Common Law ............................................45

Count III Declaratory Relief Regarding *Bivens* and *Bivens*-Style Relief.............................46

Prayer for Relief.......................................................................................................................47

Demand for Jury Trial..............................................................................................................48

## <u>NATURE OF THE ACTION</u>

    1.      Plaintiff brings this action for monetary damages—under federal district courts'

*Bivens* authority, this Court's unique authority to create a *Bivens*-style cause of action under its

enabling legislation, and/or this Court's diversity and supplemental jurisdiction—or alternatively a declaratory judgment that monetary relief is not available under the facts of this case. Although Plaintiff also has a parallel claim under the FTCA, plaintiff does not assert FTCA claims here because those claims are administratively pending before Defendants' employer, the federal Environmental Protection Agency ("EPA").

## **PARTIES**

2.      Plaintiff Williams is a natural person residing in South Carolina.

3.      Defendant Newberg is a natural person residing in Maryland. Defendant Newberg is sued in her individual capacity pursuant to 28 U.S.C. § 2679(b)(2)(A), wholly outside the FTCA and the Clean Air Act. At all times relevant to this Complaint, Newberg was the Director of EPA's Stratospheric Protection Division.

4.      Defendant Grundler is a natural person residing in Michigan. Defendant Grundler is sued in his individual capacity pursuant to 28 U.S.C. § 2679(b)(2)(A), wholly outside the FTCA and the Clean Air Act. Defendant Grundler left EPA in the interval on or about February 3, 2023. Grundler was the Director of EPA's Office of Atmospheric Programs from the inception of the events at issue to this action through February 3, 2023.

5.      Defendant Gunning is a natural person residing in Virginia. Defendant Gunning is sued in his individual capacity pursuant to 28 U.S.C. § 2679(b)(2)(A), wholly outside the FTCA and the Clean Air Act. Gunning became the Director of EPA's Office of Atmospheric Programs on or about February 6, 2023, and has been in that role since that date through the filing of this Complaint.

6.      Defendant Goffman is a natural person residing in the District of Columbia. Defendant Goffman is sued in his individual capacity pursuant to 28 U.S.C. § 2679(b)(2)(A), wholly outside the FTCA and the Clean Air Act. As of the date of this Complaint and all the actions

and inaction alleged herein, defendant Goffman is and was a registered member of the New York State Bar (Reg. No. 1779537). On or about January 31, 2024, the Senate confirmed Goffman as the Assistant Administrator for EPA's Office of Air and Radiation. On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Goffman took the oath of office then or soon after then. Prior to his Senate confirmation, Goffman served as the "Principal Deputy Assistant Administrator Performing Delegated Duties of Assistant Administrator." At all times relevant to this Complaint, therefore, Goffman either was the Assistant Administrator or served as the acting Assistant Administrator of EPA's Office of Air and Radiation.

7.      The Doe defendants are natural persons employed by or appointed to the EPA who reside—on information and belief, at least primarily—in Maryland, Virginia, or the District of Columbia. The "Doe" defendants are sued in their individual capacity pursuant to 28 U.S.C. § 2679(b)(2)(A), wholly outside the FTCA and the Clean Air Act. On information and belief, no Doe defendant resides in South Carolina at the time this action commenced.

8.      Federal entities and federal officers in their official capacities may or may not become defendants pursuant to the federal Clean Air Act or the FTCA, but they are not defendants to this Complaint.

## JURISDICTION AND VENUE

9.      This action arises out of defendants' violation of the First Amendment, U.S. CONST. amend. I, and the Due Process Clause, U.S. CONST. amend. V, which includes an equal-protection component, equivalent to the Equal Protection Clause of the Fourteenth Amendment, *Buckley v. Valeo*, 424 U.S. 1, 93 (1976); *Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974) (referencing "the equal protection of the laws guaranteed by the due process provision of the Fifth Amendment"); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), thereby raising federal questions and

civil-rights issues over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. The amount in controversy exceeds $1 million. This Court also has diversity jurisdiction under 28 U.S.C. § 1332, supplemental jurisdiction under 28 U.S.C. § 1367, and jurisdiction under the Organic Act of 1801, Ch. 15, §§ 1, 3, 5, 2 Stat. 103, 104-06 (codified as amended at D.C. Code § 11-501).

10.    Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

11.    An actual and justiciable controversy exists between Plaintiff and Defendants.

12.    All or some of the Defendants may later be sued pursuant to the FTCA, but Plaintiff does not currently have an FTCA claim within this Court's jurisdiction because his claim is still pending administratively before EPA. *See* 28 U.S.C. § 2675(a). Plaintiff filed the initial claim on or about March 28, 2024. EPA has not acted on that claim, and Plaintiff timely amended the claim by letter dated December 12, 2024, which extended the 6-month period for EPA's administrative consideration by six months to May 12, 2025. *See id.*; 28 C.F.R. § 14.2(c).

**Article III Case or Controversy**

13.    For purposes of Article III standing, a federal court accepts the plaintiff's merits view to determine whether—under that merits view—the plaintiff has a justiciable claim under Article III. Defendants' conduct denied Plaintiff valuable relief to which he was entitled, violated his constitutional right to due process and equal protection, and punished his assertion of his First Amendment right of petition. The monetary value of the allocations that Defendants wrongfully denied Plaintiff exceed $1 million. This Court has jurisdiction to award those damages to Plaintiff from Defendants.

**Sovereign Immunity**

14.    Plaintiff sues Defendants in their individual capacities. In their individual capacities, Defendants lack sovereign immunity.

15.    As a matter of historical fact, at the time that the states ratified the U.S. Constitution, the judge-made doctrine that allows use of the sovereign's courts in the name of the sovereign to order the sovereign's officers to account for their conduct (*i.e.,* the rule of law) was as least as firmly established and as much a part of the legal system as the judge-made doctrine of federal sovereign immunity. *See, e.g.,* Louis L. Jaffee, *The Right to Judicial Review I,* 71 HARV. L. REV. 401, 433 (1958). No act of Congress affirmatively limits this Court's jurisdiction for an action against Defendants' *ultra vires* or unconstitutional actions and inaction. *See* Paragraph 41, *infra*.

## LEGAL BACKGROUND

16.    Plaintiff's claims lie under the authorities outlined in the following subsections.

**Clean Air Act and Judicial Review**

17.    The Clean Air Act, 42 U.S.C. §§ 7401-7671q (as amended), is a wide-ranging federal statute addressing air quality and protections from other aspects of air pollution.

18.    As originally enacted, the Clean Air Act was subject to judicial review under the terms of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706 (as amended). *See, e.g.*, *Amoco Oil Co. v. EPA*, 501 F.2d 722, 731 (D.C. Cir. 1974); *Ethyl Corp. v. EPA*, 541 F.2d 1, 33-35 (D.C. Cir. 1976); *Nat'l Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 786 (D.C. Cir. 1976).

19.    In the 1977 amendments to the Clean Air Act, Congress enacted a "mini-APA" (*i.e.*, a set of provisions for expedited judicial review) to apply to judicial review of designated Clean Air Act actions in lieu of the APA. *See* Clean Air Act Amendments of 1977, PUB. L. NO.

95-95, § 305(a), 91 Stat. 685, 772-76 (1977) (enacting § 307(d), 42 U.S.C. § 7607(d)).

20.     The "mini-APA" provisions of § 307(d) apply to the specific EPA actions listed in § 307(d)(1)(A)-(U) and to "such other actions as [EPA] may determine" (*i.e.*, designate in advance) pursuant to § 307(d)(1)(V). *See* 42 U.S.C. § 7607(d)(1)(A)-(V).

21.     The APA continues to apply to EPA action and inaction not listed in § 307(d)(1)(A)-(U) and not designated pursuant to § 307(d)(1)(V).

22.     In the 1990 amendments to the Clean Air Act, Congress partially abrogated *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987), by moving unreasonable-delay claims from the relevant U.S. Court of Appeals pursuant to § 307(b)(1) and the All Writs Act, 28 U.S.C. § 1651(a), to the relevant district courts pursuant to the Clean Air Act's citizen-suit provisions. *See* Clean Air Act Amendments of 1990, PUB. L. NO. 101-549, § 707(f), 104 Stat. 2399, 2683 (1990) (codified at 42 U.S.C. § 7604(a)(2)).

23.     The 1990 amendments also supplemented § 307(b)(1) to provide as follows: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.." *Id.* § 706, 104 Stat. at 2682 (codified at 42 U.S.C. § 7607(b)(1)). This amendment abrogated *West Penn Power Co. v. United States Envtl. Prot. Agency*, 860 F.2d 581, 588 (3d Cir. 1988), which held that the Court of Appeals jurisdictionally *could not review* an otherwise final EPA action while a petition for administrative reconsideration was pending.

**Avenues for Administrative Reconsideration**

24.     The APA provides distinct avenues to pursue administrative reconsideration of

rules and orders. *Compare* 5 U.S.C. § 553(e) *with id.* § 555(b).

25.        Judicial review of agencies' denial of reconsideration of rules is governed by

*Nat'l Labor Relations Bd. Union v. Fed. Labor Relations Auth.,* 834 F.2d 191, 195-196 (D.C. Cir.

1987), and its progeny, whereas judicial review of agencies' denial of reconsideration of orders is

governed by *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284-85

(1987) *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284-85 (1987)

("*BLE*"), and its progeny.

26.        With respect to agencies' denial of orders, judicial review is available when the

petitioner presents either new evidence or changed circumstances or petitions administratively

within the period for judicial review. *BLE*, 482 U.S. at 285-86; *see also Sendra Corp. v. Magaw*,

111 F.3d 162, 166-67 (D.C. Cir. 1997).

27.        The Clean Air Act expressly contemplates EPA's considering petitions for

administrative reconsideration as an adjunct to petitions for review in court. *See* 42 U.S.C. §

7607(b)(1), (d)(7)(B).

28.        EPA regularly conducts conversations with and reaches settlements and revises

EPA action with parties who sue EPA and file administrative petitions for reconsideration. *See*,

*e.g.*, EPA, National Emissions Standards for Hazardous Air Pollutants, 59 Fed. Reg. 36,280,

36,283 (1994) (final rule); EPA, Renewable Fuel Standard Program: Standards for 2020 and

Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016, 7050 (2020) (final

rule); EPA, Standards of Performance for New, Reconstructed, and Modified Sources and

Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 86 Fed.

Reg. 63,110, 63,157 (2021) (proposed rule).

29.        On information and belief, formed after reasonable inquiry, which likely could

be proved with an opportunity for discovery, EPA has not previously refused to consider an administrative petition for reconsideration under the Clean Air Act because the administrative petitioner was currently seeking judicial review of the challenged EPA action.

**American Innovation and Manufacturing Act**

30.     In 2020, Congress enacted the American Innovation and Manufacturing Act ("AIM Act"), PUB. L. NO. 116-260, div. S, § 103, 134 Stat. 1182, 2255-71 (2020) (codified at 42 U.S.C. § 7675).

31.     The AIM Act authorizes EPA to promulgated regulations and makes EPA's actions—and inaction—under the AIM Act subject to Sections 113, 114, 304, and 307 of the Clean Air Act (*i.e.*, 42 U.S.C.§§ 7413, 7414, 7604, 7607). *See* 42 U.S.C. § 7675(k)(1)(A). (C).

32.     In pertinent part, the AIM Act directs EPA to promulgate a program to phase down the production of hydrofluorocarbons ("HFCs"), 42 U.S.C. § 7675(e)(1)(A), with allocations to be issued annually for the next calendar year by October 1 of the preceding calendar year. 42 U.S.C. § 7675(e)(2)(D)(i).

**HFC Program**

33.     Under the AIM Act, EPA promulgated its "framework rule" for a cap-and-trade program for HFCs, 86 Fed. Reg. 55,201 (2021); 40 C.F.R. pt.§ 84 (the "HFC Program"), to phase down HFC usage. *See* 42 U.S.C. § 7675(e)(2)(C) (90 percent reduction for 2020-23, 60 percent reduction for 2024–28, 30 percent reduction for 2029–33, 20 percent reduction for 2034–35, and 15 percent reduction for 2036 and thereafter); *accord* 40 C.F.R § 84.7.

34.     The HFC Program denominates HFC allocations in metric tons of exchange value equivalent ("MTEVe").

35.     EPA set initial HFC allocations for existing HFC manufacturers and importers

based on their historical manufacturers and importers from 2011 through 2013. *See* 42 U.S.C. § 7675(e)(1)(C); 87 Fed. Reg. 61,314 (2022); 86 Reg. 61,314, 55,116 (2021).

36.     In addition to the "general pool" of existing HFC manufacturers and importers in Paragraph 35, *supra*, the framework rule included provisions for new entrants to the market to apply for HFC allocations. *See* 40 C.F.R. § 84.15. The new-entrant set-aside program is the eventual result of Plaintiff's advocacy for a minority set-aside program in EPA's HFC Program.

***Bivens* and the FTCA**

37.     In *Bivens v. Six Unknown Fed'l Narcotics Agents*, 403 U.S. 388 (1971), and its progeny, the Supreme Court has recognized a damages remedy for constitutional violations under the rubric of inferring a remedy for cases within a federal court's federal-question jurisdiction.

38.     Federal district courts review *Bivens* claims under a two-part test. *See Buchanan v. Barr*, 71 F.4th 1003, 1007 (D.C. Cir. 2023) (collecting cases). The first prong asks if the claim arises in the same context as the three *Bivens* claims that the Supreme Court has recognized; if so, the claim can go forward. *Id.* Second, if a claim arises in a new context, the district court asks whether any "special factors counsel[] hesitation" against extending *Bivens* to that context. If so, a federal district court should not extend *Bivens* to the new context. *Id.*

39.     The FTCA waives sovereign immunity for certain damages actions against federal officers or agents. For FTCA-covered actions, the FTCA constitutes the exclusive remedy under the 1988 FTCA amendment—the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pᴜʙ. L. Nᴏ. 100-694, 102 Stat. 4563 ("Westfall Act")—codified at 28 U.S.C. § 2679(b)(1).

40.     The FTCA's exclusivity clause does not apply to two types of cases: (1) it "does not extend or apply to a civil action against an employee of the Government … which is brought

for a violation of the Constitution of the United States," *id.* § 2679(b)(2)(A), and (2) the entire FTCA—including the exclusivity clause—does not apply when the claim is one of the FTCA's exceptions listed in 28 U.S.C. § 2680(a)-(n), because "[t]he provisions of this chapter … shall not apply" to such claims. *Id.* § 2680.

41.    Nothing in the FTCA enacts or creates sovereign immunity that did not exist prior to the FTCA's enactment.

**Organic Act of 1801**

42.    This Court's enabling legislation invested the Court not only with the power of a U.S. district court but also with the common law powers of the courts of Maryland at the time of this Court's creation in 1801. Ch. 15, §§ 1, 3, 5, 2 Stat. at 104-06 (codified as amended at D.C. CODE § 11-501).

43.    At the time Congress created this Court's common law jurisdiction and authority, federal officers could be held liable for their unlawful conduct. *See*, *e.g.*, *Maley v. Shattuck*, 7 U.S. (3 Cranch) 458, 490 (1806) ("argument ... that lieutenant Maley is not liable ... would have great weight, if the circumstances ... had been such as to justify [the] seizure"); *Belknap v. Schild*, 161 U.S. 10, 18 (1896) ("officers or agents, although acting under order of the United States, are ... personally liable to be sued for their own infringement of a patent"); *cf. Levin v. United States*, 568 U.S. 503, 507 (2013) (as enacted, FTCA did not preclude lawsuits against individual tortfeasors).

44.    This unique authority has been recognized repeatedly in the line of cases from *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 580-81 (1838), to *Ganem v. Heckler*, 746 F.2d 844, 851 (D.C. Cir. 1984); *see also Stark v. Wickard*, 321 U.S. 288, 290 & n.1 (1944); *Peoples v. Dep't of Agriculture*, 427 F.2d 561, 564 (D.C. Cir. 1970).

45.    This unique authority—available only to this Court among all federal district courts—authorized this Court to recognize (*i.e.*, to create) torts not previously recognized:

> Defendant urges that neither Blackstone nor any local authority recognizes such a tort. But if we are in one of the "open spaces" in the law of this jurisdiction we must fill it as well as we can, with a view to the social interests which seem to be involved and with such aid as we can get from authorities elsewhere and from logic, and history, and custom, and utility, and the accepted standards of right conduct. We cannot evade this duty; for unless we establish a right in the plaintiff we establish a privilege or immunity in the defendant. The fact that the question is novel in this jurisdiction does not mean that the plaintiff cannot recover.

*Clark v. Associated Retail Credit Men*, 105 F.2d 62, 63-64 (D.C. Cir. 1939).

46.    As indicated by the 1939 date of the *Clark* decision, this Court's unique authority and jurisdiction under the common law survived the demise of a general federal common law in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

47.    This common law authority—which this Court inherited from Maryland and which Maryland inherited from England—extended to creating and enforcing torts against officers of the national government. *See*, *e.g.*, *Mostyn v. Fabrigas*, 98 Eng. Rep. 1021 (K.B. 1774) (recognizing damages action against colonial governor for assault and false imprisonment); *Baltimore Sun Co. v. Mayor & City Council of Baltimore*, 359 Md. 653, 661, 755 A.2d 1130, 1134 (Md. 2000) ("the rules of the common law of England were adopted as the principles which were to direct the proceedings of the provincial government, whether legislative or judicial") (interior quotations and alterations omitted).

48.    In 1970, Congress enacted the District of Columbia Court Reorganization Act of 1970, PUB. L. NO. 91-358, 84 Stat. 605 (1970) ("DCCRA"), which delegated issues that would qualify as state-law issues—if the District of Columbia were a state—to the District of Columbia Court of Appeals and the local court system under that court.

49.        With respect to federal actions and actors, this Court's jurisdiction and authority survived DCCRA's enactment, Congress confirmed that survival six years later in the legislative history of the 1976 amendments to the Administrative Procedure Act and federal-question jurisdiction. H.R. REP. NO. 94-1656, at 15-16, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6136, and the U.S. Court of Appeals for the District of Columbia Circuit confirmed that survival 14 years later in *Ganem*, 746 F.2d at 851.

50.        Because repeals by implication require "clear and manifest" legislative intent, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 662 (2007), it would require "clear and manifest" evidence of congressional intent to repeal this Court's unique jurisdiction and authority to argue that DCCRA somehow repealed this Court's unique jurisdiction and authority for federal matters.

51.        Far from the "clear and manifest" evidence of congressional intent required to impliedly repeal this Court's this Court's unique jurisdiction and authority with respect to federal actions and federal actors, there is no controlling judicial authority or legislative evidence holding that the DCCRA repealed this Court's unique jurisdiction and authority with respect to federal actions and federal actors.

**Other Relevant Non-Environmental Statutes and Regulations**

52.        Pursuant to 5 U.S.C. § 3331, federal civil servants take an oath of office to "support and defend the Constitution of the United States against all enemies, foreign and domestic," to "bear true faith and allegiance to the same," and "well and faithfully [to] discharge the duties of the office on which [they are] about to enter."

53.        Pursuant to 18 U.S.C. § 241, it is a felony for two or more people to conspire to injure or oppress either a person's free exercise or enjoyment of any right or privilege under federal

law or a person's having exercised those rights or privileges..

54.     Pursuant to 18 U.S.C. § 242, the willful deprivation of any federal rights, privileges, or immunities or imposition of different punishments, pains, or penalties because of color or race is a felony.

55.     Pursuant to 5 C.F.R. § 2635.102(e), "[c]orrective action includes any action necessary to remedy a past violation or prevent a continuing violation of this part, including but not limited to restitution."

56.     Pursuant to 18 U.S.C. § 208(a), federal officers and employees must not "participate[] personally and substantially … in a judicial or other proceeding, application, request for a ruling or other determination, … controversy, … or other particular matter in which, to his knowledge, he [or she] … has a financial interest" except as provided in 18 U.S.C. § 208(b).

57.     Pursuant to 18 U.S.C. § 208(b)(1), a federal officer or employee may avoid the requirement of 18 U.S.C. § 208(a) if he or she discloses the conflict of interest to the appropriate agency official and "receives *in advance* a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee." 18 U.S.C. § 208(b)(1) (emphasis added).

58.     Pursuant to 18 U.S.C. § 2(a), aiding and abetting is punished as the principal crime.

59.     Pursuant to 18 U.S.C. § 371, conspiracy is punished as the principal crime.

60.     Pursuant to 42 U.S.C. § 1988(a), actions that proceed under the jurisdiction created under 28 U.S.C. § 1343—along with other jurisdictional provisions not relevant here— "shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the

object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause."

61.    Pursuant to D.C. CODE § 2-1402.62 of the District of Columbia's Human Rights Act, aiding and abetting unlawful discriminatory conduct is itself unlawful discriminatory conduct.

62.    The crime-fraud exception to the attorney-client and work-product doctrine poses a two-part test: (1) the client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and (2) "the client must have carried out the crime or fraud." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997).

63.    Although 18 U.S.C. §§ 2(a), 208, 241-242, 371 neither create a private right of action nor otherwise provide for private enforcement, the facts alleged in this Complaint set out a *prima facie* case for violations of those statutes, which undermines claims of privilege.

64.    Under the crime-fraud exception to the attorney-client privilege and work-product doctrine, the proponent of discovery for otherwise privileged materials shifts the burden to a party claiming privilege. Specifically, the party seeking to overcome a privilege bears the initial burden of proof, which is met by establishing a *prima facie* case of crime or fraud, meaning probable cause thereof. *In re Grand Jury*, 475 F.3d 1299, 1305-06 (D.C. Cir. 2007); *In re Sealed Case*, 754 F.2d 395, 399 & n.3 (D.C. Cir. 1985); *United States v. Zolin*, 491 U.S. 554, 563 n.7 (1989). The party opposing privilege need not prove crime or fraud on the merits.

**Constitutional Provisions**

65.    The Due Process Clause of the Fifth Amendment includes an equal-protection

component that is coextensive with the equal-protection guarantees of the Equal Protection Clause of the Fourteenth Amendment. *Buckley*, 424 U.S. at 93; *Jimenez*, 417 U.S. at 637; *Bolling*, 347 U.S. at 499.

66.     Equal protection against racial discrimination includes not only protections based on the plaintiff's race, *Bolling*, 347 U.S. at 499, but also protections based on the race of those for whom the plaintiff advocates. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (retaliation against male coach of female basketball team for advocating for the team is discrimination *because of sex*);

67.     The First Amendment right of petition extends both to petitioning agencies and to petitioning courts for lawful relief. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972); *cf. id.* at 510 ("right of access to the courts is indeed but one aspect of the right of petition"); *cf.* Administrative Procedure Act: Legislative History, Sen. Doc. No. 79-248, 79th Cong., 2d Sess. at 359 (1946) ("right of petition is written into the Constitution itself," and the Administrative Procedure Act "confirms that right where Congress has delegated legislative powers to administrative agencies"); *id.* at 21 ("Even Congress, under the Bill of Rights, is required to accord the right of petition to any citizen," and "a petitioner [who] states and supports a valid ground for … relief, manifestly [is] entitled to … relief.").

68.     Governmental reprisal for protected First Amendment activity threatens to chill the rights protected by the First Amendment and—thus—violates the Constitution. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out").

69.     The "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

70.    The concept of "irreparable harm" is a degree of harm more than the injury required to establish a case or controversy for purposes of Article III. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149-50, 162 (2010) (Article III injuries can nonetheless fail to qualify under the higher bar for irreparable harm).

71.    The "class of one" form of equal protection provides relief if a government actor irrationally singles out an individual for disparate treatment based on criteria other than traditional equal-protection classes like race, sex, or nationality. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Class-of-one claims can arise from the government actor's personal animus or from prior interactions between the government actor and the plaintiff (*e.g.*, prior litigation or other protected activity).

**Qualified Immunity**

72.    "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

73.    Protections against retaliation for exercising First Amendment rights and against discrimination based on race or "class of one" status are "clearly established" within the meaning of the qualified-immunity doctrine.

74.    Although 18 U.S.C. §§ 2(a), 208, 241-242, 371 neither create a private right of action nor otherwise provide for private enforcement, those criminal statutes put governmental officers and agents on notice that conduct in violation of those criminal statutes is not entitled to qualified immunity and define *per se* indications of culpable conduct under tort law.

**Punitive Damages and Prejudgment Interest**

75.      Punitive damages are available in *Bivens* actions, *Carlson v. Green*, 446 U.S. 14, 21-22 (1980), and in torts committed with malice or with reckless or callous indifference to a victim's rights, *Hobson v. Wilson*, 737 F.2d 1, 63 (D.C. Cir. 1984); *Smith v. Wade*, 461 U.S. 30, 56 (1983) (evil-motive and intentional conduct as well as reckless or callous indifference to the federally protected rights of others); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 480 (2008) (recklessness), but not in FTCA actions. 28 U. S. C. § 2674 ("United States shall be liable … in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages").

76.      District courts have equitable authority to order prejudgment interest outside FTCA claims. *Compare* 28 U.S.C. § 2674 (quoted in Paragraph 76, *supra*) *with Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996) ("the use of the prime rate for determining prejudgment interest is well within the district court's discretion").

77.      Where a plaintiff sues the United States under the FTCA and individual defendants under *Bivens* or tort law, the unavailability of punitive damages and prejudgment interest for the FTCA claim makes even a successful FTCA claim a partially inadequate remedy.

## FACTUAL BACKGROUND

78.      Plaintiff relies on the following factual allegations to support the relief requested in Paragraph 222.

79.      On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Defendants—as present or former EPA employees— believe that a court's upholding EPA's action or inaction or withholding judicial review on non-merits grounds would exonerate them of civil liability.

80.    If EPA *could have* granted relief to Plaintiff (*e.g.*, on his administrative petition for reconsideration) and Defendants denied that relief on grounds that violate the Constitution or are otherwise actionably tortuous (*e.g.*, intentional discrimination or retaliation), Plaintiff has a cause of action against Defendants as individuals, even if he could not reverse the federal sovereign on non-merits grounds such as whether the *BLE* line of cases allows renewed judicial review or the Clean Air Act's 60-day window allows judicial review of EPA's denials. *See* 42 U.S.C. § 7606(b)(1).

**Plaintiff's Involvement in Refrigerant-Gas Industry**

81.    Plaintiff's connection with the refrigerant-gas industry began with his running a reclamation facility, New Era Environmental, Inc., in Sterling, Virginia, circa 1993-2001. As part of that process, Plaintiff became familiar with the regulatory and economic issues that affect the industry, including issues under the Montreal Protocol and its successive amendments and agreements.

82.    Although Plaintiff was no longer a direct industry participant—*e.g.*, as a reclaimer, importer, or manufacturer—Plaintiff continued to work as a consultant for various industry participants on both the business side and the regulatory side.

83.    Plaintiff operated his consultancy under the "dba" or trade name "New Era Group."

84.    Plaintiff worked with other industry stakeholders in a nonprofit named "New ERA Group, Inc."

**Plaintiff's Advocacy for Environmental Justice**

85.    Alongside Plaintiff's consultancy for the refrigerant industry, Plaintiff also advocated for environmental justice and minority inclusion under EPA programs implementing

the Montreal Protocol and its successive amendments and agreements.

86.     As the only Black person associated with the refrigerant industry, Plaintiff has taken it upon himself to advocate for more diversity in this industry and for equity and environmental justice not only in considering exposure, but also in how benefits are made available. Plaintiff's comments and advocacy have included the following: (a) criticizing the baseline data on which EPA based its analysis, including the lack of existing HFCs stored in the United States, their location, the rates of leaking and the exposures to the fence-line communities; (b) addressing the lack of women and Black, Brown, and indigenous people in the industry, which led him to propose a women-and-minority set-aside program for HFC allowances; (c) highlighting the lack of federal grants under these programs going to Historically Black Colleges and Universities ("HBCUs") for research.

87.     As part of his advocacy on behalf of minority and fence-line communities, as well as to highlight EPA's lack of engagement with minority-owned, woman owned, and small-business entities and stakeholders, Plaintiff worked with EPA's Office of Small Business Programs (Kimberly Patrick) and its Small Business Ombudsman (then Joan B. Rogers) to lobby the EPA program offices to enhance their consideration of environmental justice and climate change under Executive Order 12,898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 (1994). These efforts led to a meeting on November 1, 2013, between Plaintiff (with Ms. Patrick and Ms. Rogers attending with him) and Drusilla Hufford, then-Directors of EPA's Stratospheric Protection Division (with EPA program office staff—including David Donaldson (Chief. Stratospheric Program Implementation Branch), Mike James (Tracking System Manager),  and EPA staffers Luke Hall-Jordan and EPA Liz Whitely—attending with her).

88.     After the meeting on November 1, 2023, Plaintiff confronted Donaldson avid and asked whether the EPA program office was ignoring Plaintiff's efforts because Plaintiff is Black. Donaldson became defensive and expounded "I am not Racist!"

89.     In debriefing with Ms. Patrick and Ms. Rogers on the effect of the meeting on November 1, 2023, Plaintiff expressed concern to them that his effectiveness was being diminished because he was Black. Ms. Patrick and Ms. Rogers did not convey that the EPA program office would take any concrete steps to address Plaintiffs' concerns. Plaintiff concluded that the EPA program office was not considering the issues that Plaintiff sought to raise and that he would need to ally with more prominent stakeholders for the program office to consider the issues he sought to have EPA address.

90.     After the meeting on November 1, 2013, Plaintiff partnered sought to work with the Environmental and Climate Justice Program of the National Association for the Advancement of Colored People ("NAACP") to further his advocacy on behalf of minority and fence-line communities regarding environmental justice and climate change. That work led to a letter dated January 30, 2014, from Hilary O. Shelton, Director, NAACP Washington Bureau & Senior Vice President for Policy and Advocacy, to Drusilla Hufford, Director of EPA's Stratospheric Protection Division on those issues.

91.     At that time, defendant Newberg worked in the Stratospheric Protection Division under Hufford. Defendant Newberg was promoted to the Director role after Hufford's retirement.

92.     EPA Administrator Michael Regan and EPA's Rogers, Patrick, and James are Black. On information and belief, EPA's Andy Chang is of Chinese descent. Except as otherwise noted, all other EPA staff mentioned in this Complaint are Caucasian. (An additional Black man— Julius Banks—left the EPA program office on atmospheric issues in 2011 for EPA's enforcement

office because—speaking about the EPA program office on atmospheric issues—he said that "the office was not ready to take directions from a Black man."

93.     The NAACP letter sought the Stratospheric Protection Division's commitment to Executive Order 12,898, *supra*, and to include the NAACP as a stakeholder in implementing the transition of the Montreal Protocol from ozone depletion to global warming and climate change, as well as certain specific regulatory issues then pending with EPA on the phasing out of hydrochlorofluorocarbons ("HCFCs").

94.     Plaintiff has continued to work with the NAACP and its Environmental and Climate Justice Program on issues of environmental equity and climate change.

95.     The set-aside program for new entrants in the HFC program at issue here was an outgrowth of Plaintiff's advocacy for a minority set-aside program in the framework rule for EPA's HFC program.

96.     In addition to commenting on the rulemaking docket, Plaintiff wrote EPA's Administrator on July 6, 2021, as well as both EPA's Administrator and Office of Management and Budget ("OMB") Director Shalanda Young on July 23, 2021. On September 17, 2021, Plaintiff met with OMB's Office of Information and Regulatory Affairs to advocate pursuant to Executive Order 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (2021), for EPA to better consider environmental justice issues in the HFC program, including underrepresentation in the industry and the greater exposure of minority fence-line communities to emissions—which EPA staff did not adequately assess—from HFC reclaiming, blending, and packaging.

97.     On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, EPA's Office of General Counsel rejected the

minority and women set-aside program as being improper under the Supreme Court's decision in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), which led EPA to substitute the new-entrant set-aside program for Plaintiff's proposed set-aside program in the HFC framework rule.

98.     Plaintiff has been an outspoken advocate for equity to historically excluded and burdened communities. With respect to Plaintiff's advocacy, EPA has been unwilling to accept proposals that would force accountability and provide environmental equity.

**Plaintiff's Involvement in Implementing the AIM Act**

99.     Plaintiff actively participated in the rulemaking process for the framework rule for the HFC phase-out program at issue here, including advocacy for American business and for environmental justice in comments to and meetings.

100.     Plaintiff submitted comments to the rulemaking docket for the framework rule and testified at the "virtual public hearing" on the rulemaking that EPA convened on June 3, 2021. His testimony spans approximately four full pages in the transcript, from page 28 (line 11) to page 32 (line 12).

101.     In his hearing testimony, Plaintiff introduced himself as "a consultant with the New Era Group." Tr., at 28:14-15, Virtual Public Hearing, Proposal—Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the AIM Act (June 3, 2021). As explained in Paragraph 141, *infra*, New ERA Group, Inc. was dissolved in 2020.

102.     Plaintiff directed his advocacy not only to the EPA program office directly involved in developing the framework rule but also through comments and/or meetings with the Small Business Administration, the Council on Environmental Quality, and OMB, as well as with

Congressional staff.

103.    Plaintiff has worked with EPA's Office of Inspector General ("OIG") both to precipitate and to pursue a program audit of EPA's Office of Atmospheric Protection, including without limitation why EPA's Stratospheric Protection Division allocated Chinese chemical companies valuable HFC allocations based on those companies' having *unlawfully* imported refrigerant gases into the United States during the 2011-2013 baseline years.

104.    On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, EPA program staff—including defendants Goffman, Gunning, and Newberg—were aware that Plaintiff was working with OIG, based on the questions that OIG investigating staff put to EPA program staff or otherwise from EPA's dispute with Plaintiff..

**EPA's Stratospheric Protection Division**

105.    At all times relevant to Defendants' actions against Plaintiff, defendant Newberg was the Director of EPA's Stratospheric Protection Division, which is a division within EPA's Office of Atmospheric Programs, which is an office within EPA's Office of Air and Radiation.

106.    Although the Clean Air Act vests regulatory power in EPA's Administrator, EPA's Administrators often delegate authority to the various Assistant Administrators, who often then sub-delegate specific authorities to lower-tier EPA staff.

107.    On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, through a series of delegations and sub-delegations, authority for EPA's annual HFC allocations has been sub-delegated to the Director of EPA's Office of Atmospheric Programs and authority for decisions on eligibility for the HFC program was delegated to the Director of EPA's Stratospheric Protection Division. Implementation of the

AIM generally falls to EPA's Stratospheric Protection Division, although the higher offices retain some authority over aspects such as signing off on rulemakings.

108.     Even where higher-level officials sign off on rulemakings, the drafting of rules largely falls to the lower-level program offices.

109.     EPA's Stratospheric Protection Division has a pattern and practice of paying "lip service" to environmental justice but not acting on those issues. See, e.g., 86 Fed. Reg. 55,116, 55,125-29 (2021) (HFC framework rule discussion of environmental justice).

110.     At the environmental-justice meeting on November 1, 2013, *see* Paragraph 87, *supra*, EPA's Mike James—then a Manager in the unrelated area of Tracking Systems—attended the meeting with the EPA program offices. Plaintiff, who knew James, asked him after the meeting why James attended the meeting. James—who is Black—answered "I do not know: they grabbed me in the hall before the meeting and asked me to sit in," or words to that effect.

**Plaintiff's New-Market-Entrant Application under the HFC Program**

111.     On or about December 2, 2021, pursuant to 40 C.F.R. § 84.15, Plaintiff applied to be a new entrant in EPA's HFC program as "Peter Williams/dba New Era Group."

112.     For "Date of Incorporation" pursuant to 40 C.F.R. § 84.15(d)(2)(iv), Plaintiff's application identified "Un-Incorperated" to indicate that the applicant ("Peter Williams/dba New Era Group") was not a corporation.

113.     For "State License Identifier" pursuant to 40 C.F.R. § 84.15(d)(2)(v), Plaintiff's application identified "Non" to indicate that the applicant ("Peter Williams/dba New Era Group") did not have a state-issued license number.

114.     The logo on Plaintiff's cover letter and domain name (neweragroupinc.com) for the email address (peter@neweragroupinc.com) that Plaintiff used to communicate with EPA

include "inc" in conjunction with phrase "New Era Group."

115.    When EPA requested further documentation regarding corporate status through EPA's Andy Chang, the way that Chang conveyed the message in his voicemail implied that applicants needed to be incorporated, not that EPA had conflated Plaintiff (with his New Era Group dba) and a corporation named New ERA Group, Inc.

116.    On February 22, 2022, Plaintiff responded to Chang via an email with an attachment named "StructureMemo.pdf," which Plaintiff had contemporaneously uploaded to EPA's application portal to supplement Plaintiff's application. EPA's administrative record designates the email and attachment as NME_030_005 (captioned as "Re: New Era Group: HFC Set-aside application follow-up.msg"). The attachment clarifies that Plaintiff was applying as an individual.

117.    On February 22, 2022, Chang replied "10-4. Thanks."

118.    EPA's administrative record includes various filings with or by the Georgia Secretary of State related to New ERA Group, Inc. *See* NME_030_006 (captioned New Era Group Annual Reg 2014.pdf), NME_030_007 (captioned New Era Group Annual Reg 2015.pdf), NME_030_008 (captioned New Era Group Annual Reg 2016.pdf), NME_030_009 (captioned New Era group Corp Non Profit initial Filing 2014.pdf), NME 030 010 (captioned New Era Group Diss Notice 2017.pdf), NME_030_011 (captioned New Era Group Diss Notice 2020.pdf), NME 030 012 (captioned New Era Group Filing 2017.pdf), NME_030_013 (captioned New Era Group Filing 2018.pdf), NME 030 014 (captioned New Era Group Filing 2019.pdf), NME_030_015 (captioned New Era Group Filing Certificate 2014.pdf), NME_030_016 (captioned New Era Group Final Diss 2020.pdf).

119.    By letter dated March 31, 2022, signed by defendant Newburg in her capacity as

the Director of EPA's Stratospheric Protection Division, EPA denied Plaintiff's application because New ERA Group, Inc. was purportedly ineligible under the "affiliation" test in 40 C.F.R. § 84.15(c)(2) and because Plaintiff's application lacked corporate information about New ERA Group, Inc. The letter dated March 31, 2022, is incorporated by reference.

120.    Until Plaintiff received EPA's letter dated March 31, 2022, denying his HFC application, EPA had not made Plaintiff aware—and Plaintiff was not aware—that EPA staff have equated him with New ERA Group, Inc. of Georgia based on a legal analysis of the factors in the new-entrant program.

121.    Prior to March 31, 2022, EPA never communicated to Plaintiff that EPA viewed Plaintiff to be applying as a corporation generally or as either New ERA Group, Inc., or as New Era Group, Inc. specifically.

122.    As explained in Paragraphs 155-161, *infra*, Plaintiff promptly sought to correct EPA's error in conflating him with a corporation and EPA's analysis of the purported affiliation between Plaintiff and RMS of Georgia, LLC ("RMS"), including administrative petitions for EPA to reconsider the denial of Plaintiff's application.

123.    By letter dated November 8, 2024 (and emailed to Plaintiff's counsel on November 15, 2024), defendant Goffman in his capacity as Assistant Administrator for Air and Radiation denied Plaintiff's administrative petitions for reconsideration dated April 20, 2022, and December 12, 2022. The letter dated November 8, 2024 (and emailed on November 15, 2024) is incorporated by reference.

**New Era Group versus New ERA Group, Inc.**

124.    EPA's denial of Plaintiff's application is premised on conflating Plaintiff's dba or trade name ("New Era Group") for his unincorporated South Carolina business with the name

of a defunct Georgia corporation ("New ERA Group, Inc.").

125.    Plaintiff's New Era Group trade name and New ERA Group, Inc. are different entities.

126.    Plaintiff began his consultancy with the "New Era Group" trade name at some point in 2008.

127.    In 2009, Plaintiff registered the domain "neweragoupinc.com" and had a logo prepared that includes "The New Era Group, Inc." The use of "inc" in the domain name and in the logo are the only implications that Plaintiff's trade name "New Era Group" was incorporated. Plaintiff never directly represented his trade name "New Era Group" as incorporated.

128.    In the early timeframe of his consultancy, Plaintiff intended to incorporate his consultancy, but Plaintiff never did so.

129.    Although Plaintiff operated his consultancy as a sole proprietorship, he continued to use the logo and internet domain from when he had intended to incorporate.

130.    Both before New ERA Group, Inc. was incorporated and after New ERA Group, Inc. was dissolved, Plaintiff used the "New Era Group" trade name, an email address at neweragoupinc.com, and the logo on letterhead, including for comments to EPA rulemakings.

131.    Both prior to New ERA Group, Inc.'s incorporation and after New ERA Group, Inc.'s dissolution, EPA contacted Plaintiff using his New Era Group contact information, including a letter from EPA's then-Administrator Gina McCarthy to Plaintiff dated March 13, 2014.

132.    Plaintiff and small domestic refrigerant reclaimers, importers, and repackagers worked together to form New ERA Group, Inc. (Employer Identification Number 46-5711053) for charitable, educational, and scientific purposes related to the refrigerant-gas industry and obtained tax-exempt status as a public charity under § 501(c)(3) of the Internal Revenue Code (Internal

Revenue Service ("IRS") Document Locator Number 17053243340036) for New ERA Group, Inc., effective May 19, 2014.

133.     New ERA Group, Inc. contemporaneously described itself as "a nonprofit organization that represents the interests ofhydrochlorofluorocarbon-22 reclaimers and producers of alternative refrigerants."

134.     Although New ERA Group, Inc. of Georgia was perhaps intended to draw on the goodwill of Plaintiff's ongoing work with EPA under the "New Era Group" trade name, the Georgia corporation was separate from the New Era Group consultancy under which Plaintiff had been operating for many years prior to the incorporation of New ERA Group, Inc.

135.     Although industry members participated in New ERA Group, Inc. as members for advocacy purposes, New ERA Group, Inc. was merely an industry nonprofit and was not itself a direct participant in the economic aspects of the industry (*e.g.*, as a reclaimer, importer, or manufacturer).

136.     New ERA Group, Inc. filed a Form 990 with the IRS for calendar 2014 that listed Plaintiff as the Chief Executive Officer ("CEO") with a salary of $65,000 for that year.

137.     New ERA Group, Inc. filed a Form 990 with the IRS for calendar 2015 that listed Plaintiff as the CEO with a salary of $32,000 for that year.

138.     New ERA Group, Inc. filed Form 990 with the IRS for calendar 2016 that listed Plaintiff as the CEO with a salary of $51,000 for that year.

139.     Plaintiff acknowledges income of $51,000 for consultancy work performed for RMS in 2016, which RMS—through RMS's President (also New ERA Group, Inc.'s Chief Financial Officer in 2016) or its accountant—appears to have paid via New ERA Group, Inc.

140.     New ERA Group, Inc. filed Form 990s with the IRS for calendars 2017-2021

that listed Kenneth Ponder as the principal officer and CEO for those years and did not list Plaintiff as an officer.

141.     On October 22, 2020 (NME_030_016, captioned New Era Group Final Diss 2020.pdf), the Georgia Secretary of State administratively dissolved New ERA Group, Inc.

142.     Plaintiff understood his role with New ERA Group, Inc. to be that of raising funds. Plaintiff was unaware that he had been designated as CEO for any period, much less for the period 2014-2016 as New ERA Group, Inc. reported to the IRS or for the period 2014-2019 as New ERA Group, Inc. reported to the Georgia Secretary of State.

143.     While Plaintiff was knowingly active in New ERA Group, Inc. from 2014-2015, New ERA Group, Inc. was a nonprofit that did not engage in commercial activity with refrigerant gases or otherwise. New ERA Group, Inc.'s bylaws identified the corporation's purpose as "to assist with the education and environmental defense of any harmful and/or negative environmental impacts" and provided that those "educational and defense efforts include, but are not limited to, exposing governmental agencies, public service companies, and chemical producing businesses that may have products, by-products or policies that negatively impact our quality of life."

144.     EPA's rationales for denying Plaintiff's application based on New ERA Group, Inc. are frivolous for several reasons.

145.     First, and most fundamentally, Plaintiff doing business under the trade name "New Era Group" is not and legally cannot be conflated with a corporation as a matter of corporate law: "An individual doing business under a trade name is clearly a sole proprietor distinct under Georgia law from a corporation in which that individual holds stock." *Miller v. Harco Nat'l Ins. Co.*, 274 Ga. 387, 390 (2001); *see also BellSouth Corp. v. FCC*, 162 F.3d 678, 684 (D.C. Cir. 1998) ("it is obvious that there are differences between a corporation and an individual under the

law").

146.     Assuming *arguendo* that Plaintiff owned a corporation named "New Era Group, Inc.," Plaintiff—an individual. natural person—doing business as either "New Era Group" or even "New Era Group, Inc." would not be the same entity as the corporation named "New Era Group, Inc." Any suggestion otherwise is clear error and a mistake of law, and anyone maintaining the contrary position after having his or her legal mistake identified operates in bad faith, recklessly, and/or with animus.

147.     Second, Plaintiff applied as an individual, New ERA Group, Inc. cannot bridge an "affiliation" relationship under 40 C.F.R. § 84.15(c)(2) between Plaintiff and RMS, notwithstanding that Plaintiff and RMS officers both were involved with New ERA Group, Inc. in their individual capacities and notwithstanding that RMS was a member of New ERA Group, Inc. Under § 84.15(c)(2), the common entity connecting the potential affiliates must receive allowances. *See* 40 C.F.R. § 84.15(c)(2) (2022) ("Persons who … do not share corporate or common ownership, corporate affiliation in the past five years, or familial relations *with entities receiving allowances through this rule*.") (emphasis added). Here, the common entity (*i.e.*, New ERA Group, Inc.) did not receive allowances, so it cannot serve to link Plaintiff and RMS. Any suggestion otherwise is clear error and a mistake of law, and anyone maintaining the contrary position after having his or her legal mistake identified operates in bad faith, recklessly, and/or with animus.

148.     Outside of EPA's actions against Plaintiff, neither EPA nor any other federal agency has inferred an affiliated ownership or financial interest between industry stakeholders based on their common participation in an industry nonprofit. Any suggestion otherwise is clear error and a mistake of law, and anyone maintaining the contrary position after having his or her

legal mistake identified operates in bad faith, recklessly, and/or with animus.

149.    Third, given the first two points, EPA's finding that Plaintiff's application was incomplete because the application lacked certain information about New ERA Group, Inc. is clear error and a mistake of law. New ERA Group, Inc. was not involved in Plaintiff's application and, as such, nothing in EPA's regulations required Plaintiff to report any information about New ERA Group, Inc. Anyone maintaining the contrary position after having his or her legal mistake identified operates in bad faith, recklessly, and/or with animus.

150.    Fourth, assuming *arguendo* that New ERA Group, Inc. was somehow relevant, EPA's finding that Plaintiff's application lacked "the complete ownership of the company (with percentages of ownership)" pursuant to 40 CFR § 84.15(d)(2)(i) is in bad faith or a mistake of law. The materials in EPA's record clearly establish that New ERA Group, Inc. was a nonprofit Georgia corporation (NME_030_015, captioned New Era Group Filing Certificate 2014.pdf), and Georgia nonprofit corporations do not have owners, shares, or the like. *See Shorter Coll. v. Baptist Convention*, 279 Ga. 466, 471 (2005) ("a non-profit corporation does not have shareholders"); *accord Baptist Convention v. Shorter Coll.*, 266 Ga. App. 312, 315 (2004). Anyone maintaining the contrary position after having his or her legal mistake identified operates in bad faith, recklessly, and/or with animus.

151.    Fifth, assuming *arguendo* that New ERA Group, Inc. was somehow relevant, EPA's finding that Plaintiff's application lacked the "date of incorporation" pursuant to 40 CFR § 84.15(d)(2)(iv) is in bad faith because EPA's own record establishes that New ERA Group, Inc. was incorporated on May 19, 2014 (NME_030_015, captioned New Era Group Filing Certificate 2014.pdf). Although EPA lacks the authority to convert Plaintiff's application on his own behalf as an individual (*i.e.*, an unincorporated entity) in South Carolina to an application on behalf of a

different entity in Georgia, EPA's claim that it lacked the date of incorporation of that different entity demonstrates bad faith, recklessness, and/or animus.

152.    Sixth, assuming *arguendo* that New ERA Group, Inc. was somehow relevant, EPA's finding that Plaintiff's application lacked the "State of incorporation" pursuant to 40 CFR § 84.15(d)(2)(iv) is in bad faith because EPA's own record establishes that New ERA Group, Inc. was incorporated in Georgia (NME_030_015, captioned New Era Group Filing Certificate 2014.pdf). Although EPA lacks the authority to convert Plaintiff's application on his own behalf as an individual (*i.e.*, an unincorporated entity) in South Carolina to an application on behalf of a different entity in Georgia, EPA's claim that it lacked the State of incorporation of that different entity demonstrates bad faith, recklessness, and/or animus.

153.    Seventh, assuming *arguendo* that New ERA Group, Inc. was somehow relevant, EPA's finding that Plaintiff's application lacked the "State license identifier" pursuant to 40 CFR § 84.15(d)(2)(v) is in bad faith because EPA's own record establishes that New ERA Group, Inc.'s Georgia control number was 16888405 (NME_030_006, captioned New Era Group Annual Reg 2014.pdf). Although EPA lacks the authority to convert Plaintiff's application on his own behalf as an individual (*i.e.*, an unincorporated entity) in South Carolina to an application on behalf of a different entity in Georgia, EPA's claim that it lacked the State license identifier of that different entity demonstrates bad faith, recklessness, and/or animus.

154.    Eighth, assuming *arguendo* that New ERA Group, Inc. was somehow relevant and that Plaintiff was somehow affiliated with New ERA Group, Inc. or RMS, EPA's reliance on the New ERA Group, Inc. filings with Georgia's Secretary of State to establish a relationship within 5 years of Plaintiff's application—as required by 40 CFR § 84.15(c)(2)—is belied by not only Plaintiff's sworn testimony accompanying the letter dated April 20, 2022, but also by the

New ERA Group, Inc. filings with the IRS. Specifically, even accepting that Plaintiff was the CEO of New ERA Group, Inc.—which Plaintiff disputes—that role ended in 2016 according to the IRS filings.

**Efforts to Correct Defendants' Errors in Denying Plaintiff's Application**

155.    On April 1, 2022, Plaintiff had a teleconference with EPA's Luke Hall-Jordan and an EPA colleague of Hall-Jordan's named Karen about the misunderstanding of the relationship between New ERA Group, Inc., of Georgia and Plaintiff generally and Plaintiff's HFC application specifically.

156.    As confirmed by email on April 1, 2022, the upshot of the teleconference was that Hall-Jordan and his EPA colleague were not aware of any opportunities to resolve the issue, but that Hall-Jordan would regroup internally with EPA staff and to advise Plaintiff of any options.

157.    On April 20, 2022, through counsel, Plaintiff advised EPA that he was applying as an individual and requesting administrative reconsideration. *See* Letter from J. Gordon Arbuckle to Cynthia A. Newburg, Director, Stratospheric Protection Division, Environmental Protection Agency (Apr. 20, 2022).

158.    Plaintiff's letter dated April 20, 2022 (including its exhibit), is incorporated by reference.

159.    On April 26, 2022, Hall-Jordan responded that there was no internal appeal process, the decision was final, and all set-aside allowances had been allocated. He also noted receipt of the Arbuckle letter. With respect to the Arbuckle letter, the Hall-Jordan email stated as follows: "We can respond directly, but I wanted to confirm with you that he is representing you and sharing that information is OK and appropriate."

160.    Later that week, on April 29, 2022, Plaintiff emailed Cindy Bolinger—who was

34

then Gordon Arbuckle's legal assistant—about the process to follow once EPA responded to the Arbuckle letter. Plaintiff understood that he was waiting for EPA to respond to the Arbuckle letter.

161.    Other than the email from EPA's Luke Hall-Jordan on April 26, 2022, neither Plaintiff nor his counsel received a response to the letter that Mr. Arbuckle sent to EPA's Cynthia Newberg until the Goffman letter dated November 8, 2024 (and emailed to Plaintiff's counsel on November 15, 2024).

162.    On December 12, 2022, through counsel, Plaintiff renewed his request for administrative reconsideration. *See* Letter from Lawrence J. Joseph to Cynthia A. Newburg, Director, Stratospheric Protection Division, and Hans Christopher Grundler, Director, Office of Atmospheric Programs, Environmental Protection Agency (Dec. 12, 2022).

163.    Plaintiff's letter dated December 12, 2022, is incorporated by reference.

164.    On December 12, 2022, Plaintiff petitioned for review of various EPA action, including a challenge to EPA's issuance of the 2023 HFC allocations as constructively denying his administrative request for reconsideration. His Petition for Review also challenged the denial of his application and the 2022 allocation—which were published in the Federal Register on April 5, 2022—on the theory that his challenge to EPA's action was unripe until EPA acted on his request for administrative reconsideration.

165.    On December 29, 2022, after EPA's letter dated March 31, 2022, became public, RMS administratively petitioned to reverse EPA's denial letter deeming RMS and Plaintiff related entities. *See* Letter from Kenneth Ponder, President, RMS of Georgia, LLC, to Cynthia A. Newburg, Director, Stratospheric Protection Division, Environmental Protection Agency (Dec. 29, 2022).

166.    RMS's letter dated December 29, 2022 (including its exhibits), is incorporated

by reference.

167.    Plaintiff petitioned the U.S. Court of Appeals for the District of Columbia Circuit for a writ of mandamus to compel EPA to grant Plaintiff's administrative petition for reconsideration and his underlying application as a new entrant, *In re Williams*, No. 23-1269 (D.C. Cir.), which the Court of Appeals dismissed citing the need to commence the action in district court.

168.    On April 30, 2024, through counsel, Plaintiff renewed his request for administrative reconsideration. *See* Letter from Lawrence J. Joseph to Hon. Michael S. Regan, Administrator, and Joseph M. Goffman, Assistant Administrator for Air & Radiation, Environmental Protection Agency (Apr. 30, 2024) (relief requested included "that EPA grant those petitions (*i.e.*, approve his entry into the HFC Program as a new-market entrant)").

169.    Plaintiff's letter dated April 30, 2024, is incorporated by reference.

**Defendants' Intransigence, Bad Faith, and Misconduct**

170.    Throughout the process of Plaintiff's application to be a new entrant in the HFC program, his administrative petitions for reconsideration, and his petitions for review in the District of Columbia Circuit, Defendants have shown bad faith and intransigent resistance to correcting an obvious EPA error. In that process, Defendants have disparately treated Plaintiff based on one or more impermissible criteria (*i.e.*, Plaintiff's race, the race of the communities for which Plaintiff advocated, Plaintiff's having exercised First Amendment rights, Plaintiff's having contacted OIG, and simple personal animus).

171.    As to all Defendants, courts "have long recognized ... that ignorance of the law will not excuse any person, either civilly or criminally." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 581 (2010) (interior quotation marks omitted).

172.    As a member of the New York State Bar, defendant Goffman is presumptively competent in legal matters.

173.    To the extent that any of the Doe defendants are members of a state bar, they are presumptively competent in legal matters.

174.    Intransigence to correcting an obvious and indefensible error constitutes evidence of discriminatory intent from the inception (*i.e.*, the stated and indefensible grounds for the initial error are and always were mere pretexts). *Garcia v. Veneman*, 224 F.R.D. 8, 12 (D.D.C. 2004) ("a pattern of notice and refusal to correct can serve as proof of the intent element in [a] … discrimination case").

175.    Throughout Plaintiff's dispute with EPA related to EPA's denial of Plaintiff's application for new-entrant status, EPA has not responded substantively to Plaintiff's argument that he applied as an individual and that—as a matter of law—individuals cannot do business as corporations. Similarly, EPA has never responded substantively to Plaintiff's argument that he was not affiliated with either New ERA Group, Inc., or RMS within the meaning of 40 C.F.R. § 84.15(c)(2). Under *Garcia*, 224 F.R.D. at 12, that intransigence is evidence of discrimination at the inception of EPA's denial.

176.    Based on a history of double standards that operate against Blacks, Plaintiff fears that Defendants denied his application because he was the only Black new-entrant applicant and—on information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery—the only new-entrant applicant denied based on an EPA-created rationale outside the four corners of the application, either directly because of his race or because of his advocacy on behalf of minority communities.

177.    EPA's and Defendants' insensitivity to Plaintiff's reasonable concerns amplify

those concerns. To rebut Plaintiff's argument of race-based discrimination, EPA relied on data on whether applicants were "a woman- or minority-owned business," 40 C.F.R. § 84.15(d)(2)(ii), to argue that EPA had not discriminated against Plaintiff. Respondents' Opp'n to Petitioner Peter Williams's Mot. for Summ. *Vacatur*, at 20 (Apr. 17, 2023) (No. 22-1314). On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, the minorities in question are Hispanic and Asian, and some of the women in question are Caucasian. None are Black. Worse than "some of my best friends are Black," EPA—working through defendants Newberg, Goffman, Gunning, and Doe defendants—essentially has argued that "some of my best friends are not Caucasian males."

178.    At various times, all named Defendants retaliated against Plaintiff because he exercised his First Amendment right of petitioning courts. Specifically, in a related case, EPA admitted to withholding consideration of Plaintiff's administrative petition because he sued EPA. EPA Resp. in Opp'n to Pet'r Peter Williams's Mandamus Pet., at 27-28 (Nov. 17, 2023), *In re Williams*, No. 23-1269 (D.C. Cir.). Defendants Newberg and Goffman retaliated against Plaintiff from December 12, 2022, through the present. Defendant Grundler retaliated against Plaintiff from December 12, 2022, through Grundler's departure from EPA on or about February 3, 2023. Defendant Gunning retaliated against Plaintiff from on or about February 6, 2023, through the present.

179.    In connection with its 2024 HFC allocation, EPA appears to have taken action to resolve all prior EPA oversights except EPA's error regarding Plaintiff. For example, ChemPenn (14,368.8 MTEVe), EDX Industry (371,727.4 MTEVe), and USA United Suppliers of America DBA USA Refrigerants (274,023.0 MTEVe) received more favorable treatment under the 2024 allocation than they had under the 2022-2023 allocations (0.0 MTEVe, 200,000.0 MTEVe, and

200,000.0 MTEVe, respectively).

180.    While USA Refrigerants' adjustment may—or may not—have been based on its letter dated December 19, 2022, to EPA docket No. EPA-HQ-OAR-2022-0430 (Plaintiff does not have access to that letter), the administrative record certified by EPA for the 2024 allocation does not indicate that either ChemPenn or EDX Industry even contacted EPA to request an upward adjustment of their HFC allocations. On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, neither ChemPenn nor EDX Industry requested EPA's favorable upward adjustment for 2024 allocations. Instead, EPA undertook to correct all oversights except EPA's obvious oversight regarding EPA's denial of Plaintiff's application.

181.    Similarly, as RMS points out in its letter dated December 29, 2022, which Plaintiff adopts in his letter dated April 30, 2024, EPA has singled out Plaintiff (and RMS) for a form of corporate affiliation unknown in American law whereby commercial actors linked only via their respective participation in an industry nonprofit or trade association are deemed commercially affiliated entities. Under that rationale—applied only to Plaintiff's indirect, non-commercial relationship with RMS—all members of any industry nonprofit or trade association whose officers participate in the industry nonprofit or trade association are corporate affiliates.

182.    Throughout the litigation between Plaintiff and EPA, EPA acting through Defendants engaged in blame-the-victim harassment by arguing that the letter dated April 20, 2022, from Plaintiff's initial counsel—J. Gordon Arbuckle—"did not state clearly whether [Arbuckle] was acting as Williams' attorney" and then used that purported ambiguity to blame Plaintiff for EPA's inaction.

183.    EPA's repeated reliance on this false, *ultra vires*, and irrelevant argument is

further evidence of Defendants' bad faith and discrimination against Plaintiff *from the inception*.

184.    Although the parties dispute whether Plaintiff responded to EPA staff to authorize EPA's communicating with Arbuckle, it is indisputable that EPA did not substantively respond to either Plaintiff or Arbuckle pursuant to 5 U.S.C. § 555(e) (prompt response required) until the Goffman letter dated November 8, 2024 (and emailed on November 15, 2024).

185.    While EPA would be free to adopt rules or forms for counsel to appear in regulatory matters, *see*, *e.g.*, 40 C.F.R. § 22.10 (appearance rule for penalty-related administrative adjudicatory proceedings), EPA is not free to nullify—by email or otherwise—the right that the Administrative Procedure Act ("APA") provides to have representation by counsel. *See* 5 U.S.C. § 555(a); *SEC v. Csapo*, 533 F.2d 7, 10-11 (D.C. Cir. 1976) (describing "guarantee … phrased by the legislature in unequivocal terms").

186.    The Arbuckle letter was Arbuckle's appearance, stating "on behalf of Peter Williams (dba The New Era Group)." As a matter of law, nothing in EPA regulatory regime says otherwise. As a factual matter, the Arbuckle letter dated April 20, 2022, included Plaintiff's notarized affidavit of the same date. As a matter of both fact and law—as well as the letter's plain text—Arbuckle was Plaintiff's counsel. By continually arguing otherwise, EPA and Defendants demonstrate bad faith. Relying on such makeweight and meritless arguments is evidence of discrimination against Plaintiff *from the inception*.

187.    The Goffman letter dated November 8, 2024 (and emailed on November 15, 2024), is further evidence of EPA's and Defendants' bad faith. By responding only to the Arbuckle letter dated April 20, 2022, and the Joseph letter dated December 12, 2022, defendant Goffman conveniently evades the RMS letter dated December 29, 2022, and the Joseph letter dated April 30, 2024, both of which contain "new evidence" not available to Plaintiff circa March-June of

2022 (*i.e.*, when EPA initially acted and when judicial review of EPA's initial decision might have been available). By expressly invoking the *Sendra* decision—which is relevant to the availability of judicial review but not to the questions that the Goffman letter purports to be answering—defendant Goffman reveals his true outcome-oriented intent to evade review and not to answer forthrightly the questions put to him by Plaintiff's letter dated April 30, 2024, incorporated herein by Paragraph 169, *supra*.

188.    On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, defendant Goffman relied on defendant Newberg and Doe defendants to craft the Goffman letter.

189.    As set forth in Paragraphs 145-154, *supra*, EPA's and Defendants' rationales for denying Plaintiff's application are meritless. For the same reasons, EPA's and Defendants' refusal to correct their obvious error demonstrates bad faith and a discriminatory intent from the inception.

190.    For the reasons set forth in Paragraphs 170-189, *supra*, EPA—acting through Defendants—acted in bad faith and with discriminatory intent from the inception. Although Plaintiff cannot demonstrate without discovery whether that discrimination constituted race-based discrimination, advocacy-based discrimination, or discrimination based on "tribe of one" animus against Plaintiff, EPA's and Defendants' action are purely pretextual and unlawful under the Due Process Clause and First Amendment.

**Post-Denial HFC Allocations**

191.    Contemporaneously with unlawfully denying Plaintiff's new-entrant application, Defendants denied Plaintiff HFC allocations for 2022. 87 Fed. Reg. 19,683 (Apr. 5, 2022). Had Defendants acted lawfully, Plaintiff would have been allocated 200,000 MTEVe for 2022, which had a value of $600,000 at that time (*i.e.*, $3 per MTEVe).

192.     Plaintiff did not receive the HFC allocations for 2023 that he would have received but for Defendants' unlawful conduct. 87 Fed. Reg. 61,314 (Oct. 11, 2022). Had Defendants acted lawfully, Plaintiff would have been allocated 200,000 MTEVe for 2023, which had a value of $600,000 at that time (*i.e.*, $3 per MTEVe).

193.     Plaintiff did not receive the HFC allocations for 2024 that he would have received but for Defendants' unlawful conduct. 88 Fed. Reg. 72,060 (Oct. 19, 2023). Had Defendants acted lawfully, Plaintiff would have been allocated approximately 128,987.8 MTEVe for 2024, which had a value of $515,951.20 at that time (*i.e.*, $4 per MTEVe).

194.     Plaintiff did not receive the HFC allocations for 2025 that he would have received but for Defendants' unlawful conduct. 89 Fed. Reg. 84,583 (Oct. 24, 2024). Had Defendants acted lawfully, Plaintiff would have been allocated approximately 126,446.8 MTEVe for 2025, which potentially would have a value of $505,787.20 at that time (*i.e.*, potentially $4 per MTEVe), although the market value for 2025 allocations will likely not be set until late January or even February. After a market value is known for 2025 allocations, FED. R. CIV. P. 15(d) authorizes supplementing a civil complaint for events arising after the filing of a complaint.

195.     With respect to HFC allocations for 2026 and subsequent years that Plaintiff would have received but for Defendants' unlawful conduct, the amount of allocations and the monetary value of those allocations is unknown at the time of filing this Complaint. FED. R. CIV. P. 15(d) authorizes supplementing a civil complaint for events arising after the filing of a complaint.

196.     With respect to HFC allocations for years that EPA already has allocated at the time when Plaintiff prevails—either for damages in this action or for a "backpay-style" remedy in an action for equitable relief or judicial review—the amount and value of any HFC allocation(s)

that Plaintiff will receive is unknown at the time of filing this Complaint. FED. R. CIV. P. 15(d) authorizes supplementing a civil complaint for events arising after the filing of a complaint.

**Necessity for Damages to Make Plaintiff Whole**

197.    To date, Defendants' unlawful actions and inaction have wrongfully denied Plaintiff HFC allocations for the 2022, 2023, 2024, and 2025 allocation years and threaten unlawfully to deny Plaintiff HFC allocations for future allocation years.

198.    Even if Plaintiff ultimately prevails in reversing the unlawful denial of HFC allocations via the equitable relief available under direct judicial review in the U.S. Court of Appeals for the District of Columbia Circuit, such relief may be inadequate to redress Plaintiff's injury for past allocation years (*e.g.*, allocation years 2022, 2023, and 2024 at this time, and future years starting in 2025 through the time when Plaintiff ultimately prevails in reversing the unlawful denial of HFC allocations). For example, a court could decide against ordering "backpay-style" relief under which EPA would reimburse Plaintiff for past years' denied HFC allocations in current-year or future-year HFC allocations, thereby leaving Plaintiff without an equitable remedy for such past denials of HFC allocations..

199.    Even if Plaintiff ultimately prevails in reversing the unlawful denial of HFC allocations for any or all of those allocation years via the equitable relief available under direct judicial review in the U.S. Court of Appeals for the District of Columbia Circuit, such prospective or retrospective equitable relief likely will be inadequate to make Plaintiff whole without monetary damages because the value of HFC allocations at the future time when Plaintiff prevails and is awarded prospective equitable relief (*i.e.*, for future allocations) and/or retrospective equitable relief (*i.e.*, "backpay-style" relief for past allocations since 2022) likely will not have the value that those allocations would have had in the year of their intended original issuance.

200.     Monetary damages—in an amount to be proved at trial or by dispositive motion—are necessary to make Plaintiff whole for Defendants' unlawful conduct.

201.     On or about March 29, 2024, Plaintiff filed with EPA an administrative FTCA claim, to which EPA has not yet responded.

202.     On or about December 12, 2024, Plaintiff filed with EPA an amended FTCA claim, to which EPA has not yet responded.

203.     During the period covered by this action—from April 5, 2022, through the present and on to the conclusion of this matter—the United States experienced significant net inflation. For example, as of the most recent inflation data from the federal Bureau of Labor Statistics, an April 2022 dollar ($1.00) lost approximately 8 percent of its value to inflation as of November 2024 (*i.e.*, the latest data available at the time of filing the Complaint). The value lost to inflation likely will increase over the duration of the litigation and as more data become available.

204.     The inflation experienced during the period covered by this action makes the award of prejudgment interest equitable and necessary to make Plaintiff whole. *See* Paragraphs 76-77, *supra*.

## CAUSES OF ACTION

### Count I
### *Bivens* Claim for Damages as a Federal District Court

205.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

206.     Defendants have injured Plaintiff by discriminating against him in violation of the Equal Protection component of the Due Process Clause and in violation of the First Amendment.

207.     Although *Bivens* actions are available against discrimination analogous to the

injury that Plaintiff alleges in this Complaint, *Davis v. Passman*, 442 U.S. 228, 246 (1979) (finding *Bivens* cause of action and damages remedy for sex discrimination in violation of Fifth Amendment), the Supreme Court has largely retreated from inferring *Bivens* actions in new contexts against federal officers based on the separation-of-powers issue of an Article III court's inferring a cause of action and damages remedy that Congress has not enacted.

208.    Short of the Supreme Court's abrogating *Bivens*, no "special factor" that the Supreme Court has recognized counsels against holding Defendants responsible for the damage that their discrimination and retaliation caused Plaintiff.

209.    Until the Supreme Court abrogates *Bivens*, the lower federal courts are obliged to follow *Bivens* and its progeny as controlling precedent.

<u>**Count II**</u>
<u>***Bivens*-Style Claim for Damages under Common Law**</u>

210.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

211.    The separation-of-powers problem of an Article III court's inferring a cause of action and a damages remedy do not apply to this Court pursuant to the acts of Congress creating this Court as, in part, a common law court in addition to this Court's status as an Article III court: "This problem does not exist when a common-law court, which exercises a degree of lawmaking authority, fleshes out the remedies available for a common-law tort." *Hernandez v. Mesa*, 589 U.S. 93, 100-01 (2020).

212.    Before Congress enacted the DCCRA in 1970, as a partially common-law court, this Court was free to do what the Supreme Court said in *Hernandez* that common-law courts can do: "flesh[] out the remedies available for a common-law tort." *Hernandez*, 140 S.Ct. at 742.

213.    Before Congress enacted the DCCRA in 1970, this Court had the unique jurisdiction and authority to infer a common law tort and cause of action against federal officers.

*See* Paragraphs 45-46, *supra* (citing *Clark v. Associated Retail Credit Men*, 105 F.2d 62, 63-64 (D.C. Cir. 1939) and *Mostyn v. Fabrigas*, 98 Eng. Rep. 1021 (K.B. 1774)).

214.    Because the DCCRA did not transfer jurisdiction or authority over federal officers to the local District of Columbia court system, the DCCRA either repealed the Court's pre-DCCRA jurisdiction and authority by implication or left that jurisdiction and authority where it has been since 1801.

215.    Because repeals by implication are disfavored, this Court should adopt the latter interpretation to conclude that this Court retains the unique jurisdiction and authority to infer a common law tort and cause of action against federal officers.

216.    If this Court determines that *Bivens* does not extend the Plaintiff's claim against Defendants, the Court should apply its unique jurisdiction and authority to infer a common law tort and cause of action against Defendants for the damage that their unlawful conduct caused to Plaintiff.

217.    Alternatively, this Court can find diversity jurisdiction based on the amount in controversy exceeding $75,000 and the complete diversity of citizenship between Plaintiff and all Defendants. Defendants' retaliatory and discriminatory conduct violates the common law of the District of Columbia.

## Count III
## Declaratory Relief Regarding *Bivens* and *Bivens*-Style Relief

218.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

219.    In the alternative to the relief requested in Counts I and II, *supra*, if the Court denies relief on both those counts, the Court should enter declaratory relief that such damages are not available against federal employees either pursuant to Bivens and its progeny or pursuant to this Court's authority under the Organic Act of 1801, Ch. 15, §§ 1, 3, 5, 2 Stat. 103, 104-06

(codified as amended at D.C. CODE § 11-501).

220.    Declaratory relief that such damages are unavailable against federal employees would aid this Court, the U.S. Court of Appeals for the District of Columbia Circuit, and plaintiff in establishing the lack of a damages remedy in seeking equitable relief with respect to claims that plaintiff asserts under common law, equitable, and mandamus relief are available.

221.    Plaintiff pleads this Count III in the alternative to the relief sought in Counts I-II, *supra*. *See* FED. R. CIV. P. 8(a)(3), 8(d)(2)-(3) (plaintiffs may plead in the alternative).

## PRAYER FOR RELIEF

222.    WHEREFORE, Plaintiff Peter Williams respectfully asks this Court to grant the following relief:

A.    Judgment against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial or by dispositive motion;

B.    Judgment against all Defendants, jointly and severally, for punitive damages in an amount to be determined at trial or by dispositive motion;

C.    Alternatively, if the Court denies the monetary relief in the two foregoing subparagraphs, Declaratory Judgment that:

    (i)    Damages are unavailable against federal employees pursuant to the *Bivens* line of cases with respect to U.S. district courts generally; and

    (ii)    Damages are unavailable against federal employees pursuant to this Court's unique authority under the Organic Act of 1801, Ch. 15, §§ 1, 3, 5, 2 Stat. 103, 104-06 (codified as amended at D.C. CODE § 11-501), and District of Columbia common law.

D.    Plaintiffs' costs and expenses;

E.    Plaintiffs' attorney fees;

F.    Prejudgment interest to the extent provided by law;

G.    Postjudgment interest to the extent provided by law; and

H.    Such other and further relief as the Court finds just and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, plaintiff demands a trial by jury on all issues so triable.

Dated: December 12, 2024                    Respectfully submitted,

/s/ Lawrence J. Joseph

Lawrence J. Joseph, DC Bar No. 464777
Law Office of Lawrence J. Joseph
1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Plaintiff Peter Williams*